**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **(1) CISSY N. FISHER, as Guardian** ) | |
| **of CHRISTOPHER FISHER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No. 14-cv-678-TCK-PJC** |
| **(1) STANLEY GLANZ, SHERIFF OF TULSA** ) | |
| **COUNTY, in his Individual and Official** ) | |
| **Capacity;** ) | |
| **(2) CORRECTIONAL HEALTHCARE** ) | |
| **COMPANIES, INC., a Foreign Corporation,** ) | |
| **(3) SARA MORATAYA, in her Individual** ) | |
| **and Official Capacity,** ) | |
| **(4) ANDREW ADUSEI, M.D.** ) | |
| **(5) DANIEL HUDSON, L.P.N.** ) | |
| **(6) AMY WELKER, L.P.N.** ) | |
| **(7) CYNTHIA FAIRCHILD, L.P.N.** ) | |
| **(8) KAREN METCALF, L.P.N.** ) | |
| ) | |
| **Defendants.** ) | |

## THIRD AMENDED COMPLAINT

COMES NOW, Cissy N. Fisher ("Plaintiff"), as Guardian of Christopher Fisher ("Mr. Fisher"), who is mentally retarded, by and through her attorney of record, and for her amended causes of action against the Defendants, alleges and states as follows:

## INTRODUCTORY STATEMENT

1. Mr. Fisher is a thirty (30) year old male that has been adjudicated mentally retarded and disabled by the Oklahoma Department of Mental Health.  Mr. Fisher's mental retardation is a result of his severally alcoholic father assaulting and battering him when he was a child. Mr. Fisher has been administered an abbreviated battery of neuropsychological tests and all measures fell within the deficient range in comparison with same age peers.  Intellectual

1

functioning was indicated with a full scale IQ of 56, below the 1st percentile.  A simple one or two sentence conversation with Mr. Fisher makes it apparent that he is disabled and unable to comprehend and/or process new information like others.

2. Mr. Fisher is disabled and receives services from the Social Security Administration and the Oklahoma Department of Human Services, including a caseworker that checks on him regularly.  Chris Fisher's sister, Cissy Fisher, has been appointed guardian over his person and property.

3. Due, at least in part, to the severe physical and emotional abuse that Mr. Fisher suffered as a child he now suffers from seizures for which medication, lorazepam, and oxcarbazepine or trileptal, is prescribed and needed on a daily basis.  Without the medication, the seizures can be uncontrollable and foreseeably lead to hospitalization and possible further long-term damage or even death.  The likelihood of the seizures manifesting themselves also increases in situations that are strange and stressful to Mr. Fisher.

4. On November 14, 2012, Tulsa County Deputy Sheriff Danny Childers responded to a disturbance call between neighbors and Mr. Fisher. As a result of the information obtained from the neighbors, Deputy Childers arrested Mr. Fisher. Mr. Fisher's mother, Bridgette Brown, was present at the scene when Fisher was taken into custody and advised Deputy Childers that Mr. Fisher was mentally retarded, disabled, and was seriously dependent on seizure medication to prevent disabling and life-threatening seizures.

5. Mr. Fisher was thereafter booked into the David L. Moss Criminal Justice Center (hereinafter "Tulsa County Jail") on or about November 14, 2012, which is a place of "public accommodation".  Immediately upon Mr. Fisher being booked into the Tulsa County Jail, several people, to include his Sister and Guardian Cissy Fisher, his Mother, and even his DHS

caseworker, began to make phone calls to the Tulsa County Jail informing the Jail that Fisher was mentally disabled and seriously required medication to prevent seizures that could lead to disabling and life-threatening injuries.  The threat of seizures was made even more serious and foreseeable given the distressing and confusing circumstances Mr. Fisher found himself in, namely; being detained by law enforcement and taken away from his home environment and incarcerated amongst inmates responsible for serious and violent offenses.  Despite these repeated pleas and warnings from Fisher's Sister/Guardian, Mother, and DHS case worker, the Tulsa County Jail ignored these requests to distribute medications to Mr. Fisher.

6.  During the booking process, Deputy Childers completed an intake form based on his observations and the information he had obtained from Mr. Fisher's family.  Deputy Childers noted on the booking forms that Mr. Fisher has a "Mental Handicap", is "currently under psychiatric or general Doctor's Care" and is "currently taking…prescription medications".

7.  Despite Deputy Childers' notifications during the booking process, Detention Officer Sara Morataya completed another intake form that noted that Mr. Fisher does "not" require special management for mental health reasons.  Further, in another intake form regarding mental health, the jail staff indicated that Mr. Fisher has felt nervous and depressed within the past few weeks and that he has been hospitalized for mental health and emotional reasons.  On that same form it notes that Mr. Fisher was "not" taking medication(s) prescribed by a physician for mental health and emotional problems.

8.  Despite the repeated pleas for assistance in accommodating Mr. Fisher's serious medical and mental health concerns, within approximately forty-eight (48) hours after being booked into the Tulsa County Jail Mr. Fisher had significant seizures that were incapacitating and required immediate hospitalization.

9. Despite the repeated pleas for assistance in accommodating Mr. Fisher's serious medical and mental health concerns, Mr. Fisher ended up in a coma and spent approximately three (3) weeks in an intensive-care unit due to his life-threatening injuries.  Mr. Fisher was eventually released from custody during his tenure in the hospital and was unable to file and/or submit a grievance with the Tulsa County Sheriff's office for the inadequate medical and mental health treatment.

10. Despite the pleas for assistance in accommodating Mr. Fisher's serious health concerns and disabilities, it was made abundantly clear that Mr. Fisher was not properly classified and his medical and mental health needs were not adequately assessed, diagnosed or treated.  The lack of concern and/or treatment of Mr. Fisher was not based on any reasonable or legitimate penological interest, and created a significant risk to the health and safety of an inmate that had been identified as a disabled person.  Further, the failure to address Mr. Fisher's needs did not place a financial or administrative burden on the Tulsa County Sheriff's office.

11. As an inmate with serious and known medical and mental health needs, Mr. Fisher was not adequately supervised or monitored, resulting in an utter failure to protect Mr. Fisher from obvious risks of serious harm.  Defendants ignored and/or disregarded the known and obvious risk that severe harm could result to Mr. Fisher from the lack of adequate medical and mental health assessments and treatment, classification, supervision or protection. Defendants simply ignored and failed to provide Mr. Fisher with adequate supervision and care, and failed to take other reasonable measures to protect him from physical harm, which evinces a deliberate indifference to Mr. Fisher's health and safety.

12. With respect to the criminal charges that led to Mr. Fisher's brief incarceration, he was found to be "not competent and unable to achieve competency", and "not a danger to himself or

others", and the criminal matter was stayed indefinitely by the District Court's Order of May 14, 2014.

13. Mr. Fisher fell victim to a culture of indifference toward inmate health, safety and well-being. Consistent with unwritten and long-standing established policies, practices and/or customs, Defendants failed to provide Mr. Fisher with adequate medical and mental health assessments and treatment, classification, supervision or protection, in deliberate indifference to his health and safety.

14. Upon information and belief, Mr. Fisher was processed through booking and intake at the Tulsa County Jail in a manner just like any other normal individual without serious medical and/or mental disability issues, which evinces a deliberate indifference to special needs of Mr. Fisher.

## JURISDICTION AND VENUE

15. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

16. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983 and the Americans with Disabilities Act.

17. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

18. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Northern District of Oklahoma.

**PARTIES**

19. At all pertinent times, Mr. Fisher was a resident of Tulsa County, Oklahoma, which is in the Northern District of Oklahoma.  At the time of the filing of this matter, Mr. Fisher was not an inmate and/or currently incarcerated at the David L. Moss Correctional Center.  Further, Mr. Fisher is, at all times relevant to this Complaint and thereafter, is a disabled person and was denied full and equal treatment to accommodate his disability.

20. Defendant Stanley Glanz ("Sheriff Glanz" or "Defendant Glanz") is, and was at all times relevant hereto, the Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma and acting under color of state law. Defendant Glanz, as Sheriff and the head of the Tulsa County Sheriff's Office ("TCSO"), was, at all times relevant hereto, responsible for ensuring the safety and well-being of inmates detained and housed at the Tulsa County Jail, including the provision of appropriate medical and mental health care and treatment to inmates in need of such care, pursuant to 57 O.S. § 47. In addition, Defendant Glanz is, and was at all times pertinent hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of TCSO and Tulsa County Jail, including the policies, practices, procedures, and/or customs that violated Mr. Fisher's rights as set forth in this Complaint. Defendant Glanz is sued in his individual and official capacities.

21. During all pertinent time periods, Defendant Correctional Healthcare Companies, Inc. ("Defendant CHC") was a foreign corporation doing business in the Northern District of Oklahoma, and was at all times relevant hereto, responsible for providing medical services

and medication to Mr. Fisher while he was in the custody of TCSO. CHC was contracted and additionally responsible, in part, for creating and implementing policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees. CHC was contracted and, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that CHC became an agency or instrumentality of the State and subject to its constitutional limitations.

    a.   Andrew Adusei, M.D., was an employee of CHC at the Tulsa County jail, during the time of the treatment of Plaintiff Chris Fisher and participated in the deficient treatment Mr. Fisher received.

    b.   Daniel Hudson, L.P.N., was an employee of CHC at the Tulsa County jail, during the time of the treatment of Plaintiff Chris Fisher and participated in the deficient treatment Mr. Fisher received.

    c.   Amy Welker, L.P.N., was an employee of CHC at the Tulsa County jail, during the time of the treatment of Plaintiff Chris Fisher and participated in the deficient treatment Mr. Fisher received.

    d.   Cynthia Fairchild, L.P.N., was an employee of CHC at the Tulsa County jail, during the time of the treatment of Plaintiff Chris Fisher and participated in the deficient treatment Mr. Fisher received.

    e.   Karen Metcalf, L.P.N., was an employee of CHC at the Tulsa County jail, during the time of the treatment of Plaintiff Chris Fisher and participated in the deficient treatment Mr. Fisher received.

22. Detention Officer Sara Morataya (D.O. Morataya) was at all time relevant hereto, an employee and/or agent of the Tulsa County Sheriff's Office, and acting under color of state law. D.O. Morataya was responsible for overseeing Mr. Fisher's health and well-being, and assuring that his medical and/or mental health needs were met, during the time he was in the custody of TCSO. D.O. Morataya is being sued in her individual and official capacity.

## FACTUAL ALLEGATIONS

23. Plaintiff re-alleges and incorporates the preceding paragraphs as though fully set forth herein.

24. TCSO policy requires that inmates are to be classified in a way that provides safe, humane inmate treatment.  The policy further requires the classification officer to privately interview the inmate to determine any "history of mental illness" and/or serious medical concerns.

25. The Oklahoma Jail Standards also require that "[t]hose individuals who appear to have a significant medical or psychiatric problem … shall be transported to the supporting medical facility as soon as possible" and "shall be housed separately in a location where they can be observed frequently by the staff at least until the appropriate medical evaluation has been completed…."

26. The Tulsa County Sheriff's Office policy and procedures defines "Mental Illness" as "(A)ny of various conditions characterized by impairment of an individuals normal cognitive, emotional, or behavioral functioning, and caused by social, psychological, biochemical, genetic, or other factor, such as infection or head trauma."  "Mentally Retarded Person" is defined as "(A)s defined in Title 10 of the Oklahoma Statutes, a mentally retarded person is a person afflicted with mental defectiveness from birth or from an early age to such an extent that he is incapable of managing himself or his affairs, who for his own welfare or the welfare of others or of the community requires supervision, control, or care, and who is not mentally

ill or of unsound mind to such an extent as to require his certification to an institution for the mentally ill." According to these definitions Mr. Fisher was classified as both mentally ill and mentally retarded.

27. TCSO does not have policies, procedures or training in place, which would guide a Deputy in their initial approach, handling, investigation or arrest of mentally ill or mentally retarded individuals.

28. Defendants disregarded the known and obvious risk that severe harm could result to Mr. Fisher from the lack of adequate medical and mental health assessments and treatment, classification, supervision or protection. The lack of supervision and protection of Mr. Fisher is also consistent with a policy or custom, written or unwritten, at the Jail of understaffing and overcrowding at the Jail.

29. Nevertheless, in violation of these, and other, applicable policies and standards, Mr. Fisher was merely assigned to a general population pod by responsible personnel. Mr. Fisher was not referred to any mental health specialist and no further action was taken to assure that Mr. Fisher's serious mental health needs were met. Mr. Fisher was not housed separately in a location where he could be observed frequently by the staff at least until the appropriate medical evaluation had been completed.

30. Compounding the Defendants' failure to properly classify and monitor the Plaintiff Mr. Fisher, it should have been apparent to anyone dealing with Mr. Fisher that he was not capable of communicating to employees at the Jail what his medical needs were, thus, the Jail staff should have taken the precautions of accepting medical requests from his family and DHS caseworker or even reached out to the family or caseworker themselves.

31. Defendant Morataya, and the other booking staff at the Jail, served as a gatekeeper for a public facility responsible for accommodating inmates who suffer from disabilities. This gatekeeper role would be the only way to properly identify disabled persons so that other professionals would be alerted and made responsible for properly diagnosing and treating Mr. Fisher's, and other inmates similarly situated, conditions. In fact, it could have been as easy as recognizing what prescriptions Mr. Fisher required and communicated with the family and/or health care provider to ensure that the medications were first obtained through the family and/or health care provider, and then taken as prescribed.

32. Defendant Morataya, and the other booking staff at the Jail, utterly failed in performing this gatekeeper role. In violation of applicable policies and standards, and in disregard for the substantial risks to his health and safety, Childers and Morataya, and the other booking staff at the Jail simply ran Mr. Fisher through the booking process and placed him amongst the general population. Despite his known and serious medical and mental health care problems, Mr. Fisher was not provided with any constitutionally sufficient medical and mental health care, monitoring or supervision.  In fact the Jail staff ignored the repeated requests of Mr. Fishers family and DHS caseworker to provide Fisher with the appropriate medical treatment and medications.

33. While Mr. Fisher should not have been sent to a general population cell to begin with, once placed there, medical and correctional staff should have been on high alert due to the substantial risks to Mr. Fisher's safety. However, as evidenced by the seizures that Mr. Fisher suffered from, Mr. Fisher was faced with utterly inadequate, or non-existent, supervision and protection, in deliberate indifference to his health and safety.

34. It was known or obvious that Mr. Fisher's serious medical and mental health problems, including his inability to communicate in a reasonably coherent manner, posed a significant danger of harm if Mr. Fisher were left unmonitored.  Additionally the repeated pleas of Mr. Fishers' family and DHS caseworker to have him placed on his prescription medication went ignored.  Mr. Fisher's obvious disability combined with the repeated pleas of his family and caseworker created a substantial risk to the health and safety of Mr. Fisher. These risks were disregarded, and Plaintiff suffered a substantial and life-threatening injury as a result.

35. Defendants' deliberate indifference to the known or obvious risks to Mr. Fisher's physical health, safety and well-being was a direct and proximate cause of his injuries.

36. The deliberate indifference to Mr. Fisher's health and safety, as summarized herein, was in furtherance of, and consistent with:

    a) policies, customs and/or practices, whether written or unwritten, which Sheriff Glanz promulgated, created, implemented or possessed responsibility for the continued operation of the Tulsa County Jail; and,

    b) policies, customs and/or practices, whether written or unwritten, which Defendant CHC developed and/or had responsibility for implementing and which Defendant CHC failed to implement or continued with the policies indicating deliberate indifference.

37. There are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Tulsa County Jail. Sheriff Glanz and Defendant CHC have long known of these systemic deficiencies and the substantial risks to inmates like Mr. Fisher, but have failed to take reasonable steps to alleviate those deficiencies and risks.

38. For instance, in 2007, the National Commission on Correctional Health Care ("NCCHC"), a corrections health accreditation body, conducted an on-site audit of the Jail's health services program. At the conclusion of the audit, NCCHC auditors reported serious and systemic deficiencies in the care provided to inmates, including failure to perform mental health screenings, failure to fully complete mental health treatment plans, failure to triage sick calls, failure to conduct quality assurance studies and failure to address health needs in a timely manner. NCCHC made these findings of deficient care despite Defendant CHC and Sheriff Glanz's efforts to defraud the auditors by concealing information and falsifying medical records and charts.

39. Sheriff Glanz and Defendant CHC failed to change or improve any health care policies or practices in response to the NCCHC's findings.

40. An August 2009 investigation of the suicide death of an inmate conducted by the Oklahoma Department of Health uncovered several violations of the Oklahoma Jail Standards. Specifically, the Department of Health found: (a) "The inmate indicated a form of mental illness on his screening yet it appeared that the proper steps as required in the Jail Standards were not taken"; (b) the amount of time that the Jail allows for a mental health evaluation is in direct conflict with the Jail Standards; (c) the inmate was not properly segregated from the general population; (d) the inmate received an inappropriate medical evaluation; and (e) the inmate was not, but should have been, housed in an area for more frequent observations. See Oklahoma State Department of Health Report on Death Investigation (Jernegan), 8/3/09.

41. As with the NCCHC findings in 2007, the Department of Health findings in 2009 strongly signaled that inmates with mental health problems were being put at excessive risk by

inadequate assessments and untimely treatment. However, Sheriff Glanz and Defendant CHC failed to take reasonable steps to alleviate the known and excessive risks.

42. NCCHC conducted a second audit of the Jail's health services program in 2010.  After the audit was completed, the NCCHC placed the Tulsa County Jail on probation.

43. During the 2010 NCCHC audit process, CHC's Vice President of Accreditation orchestrated -- and was directly involved in -- the falsification of records and doctoring of files at the Tulsa County Jail for the purpose of defrauding the NCCHC auditors.

44. Despite Defendant CHC's efforts to defraud the auditors, the NCCHC once again found numerous serious deficiencies with the health services program. As part of the final 2010 Report, NCCHC found, *inter alia*, as follows: "The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness"; "There have been several inmate deaths in the past year.... The clinical mortality reviews were poorly performed"; "The responsible physician does not document his review of the RN's health assessments"; "the responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff"; "…diagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician"; "if changes in treatment are indicated, the changes are not implemented…"; "When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does not issue follow-up orders as clinically needed"; and "… potentially suicidal inmates [are not] checked irregularly, not to exceed 15 minutes between checks. Training for custody staff has been limited. Follow up with the suicidal inmate has been poor." 2010 NCCHC Report (emphasis added).

45. Sheriff Glanz is unaware of any policies or practices changing at the Jail since the 2010 NCCHC Report was issued. While Defendant CHC submitted written corrective action plans in response to the 2010 NCCHC Report, Defendant CHC had no intention of actually following the corrective action plans, and did not take the corrective measures necessary to alleviate the obvious and substantial risks to inmate health identified by the NCCHC.

46. Importantly, the "physician"/"responsible physician" referred to in the 2010 NCCHC Report was Dr. Andy Adusei. Thus, Defendants long knew that Dr. Adusei posed substantial risks to the health and safety of inmates with serious medical needs.

47. Over a period of many years, Tammy Harrington, R.N. ("Director Harrington"), Defendant CHC's former Director of Nursing ("DON") at the Jail, observed and documented many concerning deficiencies in the delivery of health care services to inmates. The deficiencies observed and documented by Director Harrington include: chronic failure to triage inmates' requests for medical and mental health assistance; doctors (particularly, Dr. Adusei and Dr. Washburn) refusing and/or failing to see inmates with life-threatening conditions; Defendant CHC's Health Services Administrator ("HSA") repeatedly instructing staff to alter and falsify medical records; a chronic lack of supervision of clinical staff; and repeated failures of Defendant CHC to alleviate known and significant deficiencies in the health services program at the Jail. Director Harrington reported the deficiencies to Defendant CHC, but Defendant CHC took no meaningful action to correct the deficiencies.

48. Robin Mason ("Nurse Mason"), a registered nurse, and graduate of the University of Texas School of Nursing, resigned from her employment at the Jail on October 19, 2010, after making repeated complaints to Defendant CHC of delays in inmate mental health care due to the incompetence and deliberate indifference of certain medical personnel. Nurse Mason's

complaints fell on deaf ears as Defendant CHC made no effort to alleviate the deficient care provided at the Jail.

49. On September 29, 2011, U.S. Immigration and Customs Enforcement ("ICE") and U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported their findings in connection with an audit of the Jail's medical system as follows: "CRCL found a prevailing attitude among clinic staff of indifference…."; "Nurses are undertrained. Not documenting or evaluating patients properly."; "Found one case clearly demonstrates a lack of training, perforated appendix due to lack of training and supervision"; "Found two … detainees with clear mental/medical problems that have not seen a doctor."; "[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake"; "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years". "ICECRCL Report, 9/29/11 (emphasis added).

50. Director Harrington did not observe any meaningful changes in health care policies or practices at the Jail after the ICE-CRCL Report was issued.

51. On the contrary, less than 30 days after the ICE-CRCL Report was issued, on October 27, 2011, another inmate, Elliott Earl Williams, died at the Jail as a result of truly inhumane treatment and reckless medical neglect which defies any standard of human decency.

52. After Mr. Williams died, Director Harrington provided Defendant CHC with documentation of systemic deficiencies within the Jail's medical program that likely contributed to his death, including chronic delays in responding to inmates' serious medical and mental health needs. However, neither Defendant CHC nor Sheriff Glanz made any meaningful improvements to the medical system. This is evidenced by the fact that yet another inmate, Mr. Brown, died due to grossly deficient care just months after Mr. Williams.

53. On November 18, 2011, AMS-Roemer, the Jail's own retained medical auditor, issued its Report to Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality" and issues with "nurses acting beyond their scope of practice [which] increases the potential for preventable bad medical outcomes." AMS-Roemer Report, 11/8/11 (Ex. 25) at CHM0171-72. AMS-Roemer specifically commented on no less than six (6) inmate deaths (including the death of Mr. Jernegan), finding deficiencies in the care provided to each. Id. at CHM0168-69; 0171.

54. It is clear that Sheriff Glanz and Defendant CHC did little, if anything, to address the systemic problems identified in the November 2011 AMS-Roemer Report, as AMS-Roemer continued to find serious deficiencies in the delivery of care at the Jail.  For instance, as part of a 2012 Corrective Action Review, AMS-Roemer found "[d]elays for medical staff and providers to get access to inmates," "[n]o sense of urgency attitude to see patients, or have patients seen by providers," failure to follow NCCHC and CHC policies "to get patients to providers," and "[n]ot enough training or supervision of nursing staff." During an April 2012 audit, Dr. Roemer found that nurses were not providing timely triage of mental health requests and that they needed "education in mental health sick call triage…."

55. In June of 2012, five (5) months prior to Fisher's booking into the Tulsa County Jail, Ms. Bridget Revilla was booked into the Tulsa County Jail.  Ms. Revilla suffered from serious medical and mental health issues including diabetes, seizure disorder and schizophrenia that required daily monitoring as well as daily medications.  Ms. Revilla submitted the medically necessary requests to Tulsa County Jail staff, which went ignored. Ms. Revilla ended up having seizures that required emergency hospitalization.  After Ms. Revilla was stabilized and

returned to the Jail, her medications were improperly administered and she began to suffer side effects which caused her to attempt to hang herself.  She was again rushed to the hospital, stabilized and returned to the Jail.  Even after retuning to the Jail from the third trip to the hospital, Ms. Revilla was never seen by a physician, was not provided with any of her prescribed medications, and was not adequately monitored or supervised.

56. Further, In September of 2012, just two (2) months prior to Mr. Fisher being booked into the Tulsa County Jail, a Mr. Charles Fisher was booked into the Tulsa County Jail.  Upon booking Mr. Fisher made the booking staff aware of current problems associated with a serious mental illness.  Mr. Fisher had been booked into the Tulsa County Jail multiple times before, and the Jail was made aware of Mr. Fisher's issues at those times as well.  Additionally, Mr. Fisher made numerous complaints to the staff of the Jail pleading for his medications.  Despite the more than adequate warning the Tulsa County Jail received regarding Mr. Fisher's mental health issues, he was not provided his medication and was placed into general population wherein he received a severe beating from other inmates.

57. There is a well-established policy, practice and/or custom, whether written or unwritten, of understaffing the Jail and failing to adequately assess, treat and supervise inmates with serious mental health needs.  There is also a continuing policy or custom, whether written or unwritten, of overcrowding the Jail and failing to protect inmates with serious mental health needs.

58. Sheriff Glanz continued to retain Defendant CHC as the Jail's medical provider long after many serious deficiencies with the Jail's medical program had repeatedly been brought to light.

59. As alleged herein, there are deep-seated and well-known policies, practices and/or customs of systemic, dangerous and unconstitutional failures to provide adequate medical and mental health care to inmates at the Tulsa County Jail. This system of deficient care -- which evinces fundamental failures to train and supervise medical and detention personnel -- created substantial, known and obvious risks to the health and safety of inmates like Mr. Fisher. Still, Sheriff Glanz and Defendant CHC failed to take reasonable steps to alleviate the substantial risks to inmate health and safety, in deliberate indifference to Mr. Fisher's health and safety.

## FIRST CLAIM FOR RELIEF

### *Violation of the Eighth and Fourteenth Amendments*
### *to the Constitution of the United States*
### *(42 U.S.C. § 1983)*

**A.  Allegations Applicable to all Defendants**

60. Plaintiff re-alleges and incorporates the preceding paragraphs as though fully set forth herein.

61. Defendants knew and/or were deliberately indifferent to the strong likelihood that Mr. Fisher was in danger of serious injury and harm as set forth herein.

62. Defendants failed to provide an adequate mental health care and supervision to Mr. Fisher while he was placed at the Tulsa County Jail.

63. Defendant's acts and/or omissions as alleged herein, including but not limited to, their failure to provide Mr. Fisher with adequate supervision and/or to take other reasonable measures to protect him from injury.  The repeated pleas of Mr. Fisher's family and DHS caseworker to address his immediate and serious medical and mental health needs constitutes a deliberate indifference to Mr. Fisher's health and safety, which in turn, directly and proximately caused his injuries.

64. As a direct and proximate result of Defendant's conduct, Mr. Fisher experienced physical pain, severe emotional distress, mental anguish, injury, and the damages alleged herein.

65. The Defendants acts were sufficiently harmful to evidence a deliberate indifference to the serious medical needs of Mr. Fisher, as clearly stated herein.

66. The aforementioned acts and/or omissions of the individually named Defendants were malicious, reckless and/or accomplished with a conscious disregard of Mr. Fisher's rights thereby entitling Plaintiff to an award of exemplary and punitive damages.

**B.  Supervisor and Official Capacity Liability (Sheriff Glanz)**

67. Plaintiff re-alleges and incorporates the preceding paragraphs as though fully set forth herein.

68. The aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Mr. Fisher's health and safety, and violating Mr. Fisher's civil rights were the direct and proximate result of customs, practices and policies which Sheriff Glanz promulgated, created, implemented and/or possessed responsibility in maintaining.

69. Such policies, customs and/or practices are specifically set forth herein.

70. Sheriff Glanz, through his continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to inmates', including Mr. Fisher's, health and safety.

71. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Fisher suffered injuries and damages as alleged herein.

**C.  Municipal Liability (Defendant CHC)**

72. Plaintiff re-alleges and incorporates the preceding paragraphs as though fully set forth herein.

73. Defendant CHC is a "person" for purposes of 42 U.S.C. § 1983.

74. At all times pertinent hereto, Defendant CHC was acting under color of state law.

75. Defendant CHC was endowed by Tulsa County with powers or functions governmental in nature, such that Defendant CHC became an instrumentality of the State and subject to its constitutional limitations.

76. Defendant CHC was charged with implementing and assisting in developing the policies of TCSO with respect to the medical and mental health care of inmates at the Tulsa County Jail, and have shared responsibility to adequately train and supervise their employees.

77. There is a direct and affirmative causal link between the aforementioned deliberate indifference to Mr. Fisher's serious medical needs, health, and safety, and violations Mr. Fisher's civil rights, and the above-described customs, policies, and/or practices carried out by Defendant CHC.

78. Defendant CHC knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Mr. Fisher.  Nevertheless, Defendant CHC failed to take reasonable steps to alleviate those risks in deliberate indifference to inmates', including Ms. Fisher's, serious medical needs.

79. Defendant CHC tacitly encouraged, ratified, and/or approved of the unconstitutional acts and/or omissions alleged herein.

80. There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Ms. Fisher's injuries and damages as alleged herein.

**SECOND CLAIM FOR RELIEF**

*Violation of Article II § 7 and § 9 of the*
*Constitution of the State of Oklahoma*

81. Plaintiff re-alleges and incorporates the preceding paragraphs as though fully set forth herein.

82. The Constitution of the State of Oklahoma, under Article II § 7, provides that an Oklahoma citizen shall not be "deprived of life, liberty, or property, without due process of law."  Mr. Fisher has adequately shown that the denial, delay, or deprivation of access to medical care evidences a deliberate indifference to his serious medical needs.   The Defendants, collectively, ignored and/or failed to act despite their knowledge of a substantial risk of serious harm.  The Defendants failure to provide adequate care was not mere inadvertence, since his medical and mental health status was made known at the time of admission, and thereafter until such time as Mr. Fisher's body gave way to significant and life-threatening seizures due to the lack of medical attention.

83. The Constitution of the State of Oklahoma, under Article II § 9, provides a private right of action for Mr. Fisher, and all other inmates who are in pre-trial custody, to be free from "cruel and unusual punishments inflicted", which includes the provision of adequate mental and physical health care.

84. As set forth herein, Mr. Fisher was denied adequate mental and physical health care, and denied sufficient supervision and protection and suffered a severe onset of seizures causing physical harm and an extended stay in intensive care. Defendants violated the rights of Mr. Fisher by failing to provide him with prompt and adequate supervision, failing to intervene to

prevent further injury, overpopulating the jail, and understaffing the jail despite the obvious need.

85. At all times relevant, the jail personnel described in this Complaint were acting within the scope of their employment and under the direct control of Defendant Glanz, the Sheriff of Tulsa County and/or Defendant CHC.

86. Defendants' failure to supervise and provide adequate mental and physical health care and protection to Mr. Fisher was the direct and proximate cause of Mr. Fisher's injuries, physical pain, severe emotional distress, mental anguish, and all other damages alleged herein.

## THIRD CLAIM FOR RELIEF

*Negligence – Defendants - CHC, ANDREW ADUSEI, M.D., DANIEL HUDSON, L.P.N., AMY WELKER, L.P.N., CYNTHIA FAIRCHILD, L.P.N., and KAREN METCALF, L.P.N.*

87. Plaintiff re-alleges and incorporates the preceding paragraphs as though fully set forth herein.

88. Defendants owed a duty to Mr. Fisher, and all other inmates in custody, to use reasonable care to provide inmates in need of medical attention with appropriate treatment.

89. Defendants breached that duty by failing to identify and provide Mr. Fisher with prompt and adequate medical and mental health treatment despite Mr. Fisher's obvious needs. The actual care provided to Mr. Fisher, if any, was deficient and fell well below the accepted standard of care that Defendants undertook when it agreed to supervise and administer the health care program at the Tulsa County Jail.

90. Defendants breaches of the duty of care include, but are not limited to: the failure to treat Mr. Fisher's serious medical and mental health condition properly; the failure to conduct appropriate medical and mental health assessments upon admission into the jail facility; the

failure to create, implement, and enforce appropriate medical and mental health treatment plans; the failure to promptly evaluate Mr. Fisher's physical and mental health; the failure to properly identify the need for prescription medications for a potentially life-threatening illness; ignoring repeated requests from Mr. Fisher's family regarding Mr. Fisher's serious medical condition that if left untreated, could be life-threatening; the failure to provide access to medical and mental health personnel capable of evaluating and treating his serious health needs; the failure to take reasonable and necessary precautions to prevent Mr. Fisher from further injury; and administering medication in a manner that deviates from accepted norms.

91. It is widely known in the medical community, missed dosages of necessary anticonvulsant medications are one of the most common reasons for serious and life-threatening breakthrough seizures.  Because of this, any reasonable and competent medical personnel responsible for the safe-keeping of individuals susceptible to seizures would know, or should know, that the failure to maintain a person on their seizure medications may cause serious and life-threatening injuries. The failure to identify, diagnose and treat individuals who are heavily dependent on medications to regulate their seizure activity constitutes a deviation from accepted norms.

92. As a direct and proximate cause of Defendants' negligence, Mr. Fisher was prevented from obtaining his prescription medication, which in turn caused his body to be susceptible to seizure activity.  Despite the repeated attempts to notify the Defendants of the serious need for medical treatment and supervision, which was ignored, Mr. Fisher experienced an episode of severe seizures which required life-saving hospitalization.

93. Defendant CHC is liable for its own negligence, and vicariously liable for negligence of their employees and agents who operate at the Tulsa County Jail to provide medical services to the inmates.

## FOURTH CLAIM FOR RELIEF

### Violation of the Americans With Disabilities Act ("ADA")
### and Rehabilitation Act

94. Plaintiff re-alleges and incorporates the preceding paragraphs as though fully set forth herein.

95. The Tulsa County Jail is a public entity covered by the ADA, specifically, a place of public accommodation.

96. Plaintiff Mr. Fisher is a qualified individual with a disability according the ADA due to his mental retardation and seizure disorder.  This disability was known to the Defendants at the time of his booking and subsequent placement within the jail.

97. Although the Defendants were made aware of Mr. Fisher's medical and mental health condition, he was prevented access to appropriate programs and segregation from the general population because Mr. Fisher was unable to articulate his disability and need for medication. This practice of failing to provide reasonable accommodations to obviously disabled inmates created a significant risk to the health and safety to the disabled individuals and to the inmates that are housed with the disabled.

98. According to the Oklahoma Jail Standards, which apply to the Tulsa County Jail, "prisoners who are mentally ill shall be separated from other prisoners.  Every effort shall be made to contact a local hospital, clinic or mental health facility for the detention of the mentally ill."

99. In this matter, Mr. Fisher was not segregated, placed in the general population, and denied access to a program of adequate medical care because of his disability, specifically; because he was unable to articulate his current medical and mental health status and serious need for

immediate medical supervision.  Although Defendants were made aware of Mr. Fisher's obvious disability from his family, his DHS caseworker, and even information received from Deputy Childers at the time of booking and admission, they failed to act and/or ignored the accommodations that should have been afforded to Mr. Fisher for his protection as mandated by the Oklahoma Jail Standards.

100.    The segregation of the mentally ill, and adequate physical and mental health care is a service that the Tulsa County Jail is required to provide, which Plaintiff was denied participation in.  Namely, Defendants denied Plaintiff segregation for his protection and access to the medications he needed to prevent debilitating and life-threatening seizures.  This denial of full and equal treatment, which should be afforded to mentally ill persons, due to his disability was a direct cause of Mr. Fisher's injuries.

101.    Defendants' failure to provide Plaintiff with adequate medical care, i.e., provide Plaintiff with his required medications, was the sole and proximate cause of the seizure episode he suffered while in Defendants' custody.

WHEREFORE, based on the foregoing, Plaintiff Fisher prays that this Court grant him the relief sought including, but not limited to, actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive damages against the Defendants in their Individual Capacity in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, costs and expenses of this litigation and all other relief deemed appropriate by this Court.

Respectfully Submitted,


  /s/ Joseph Norwood
Joseph Norwood
Norwood Law Firm P.C.
Council Oak Center
1717 S. Cheyenne Ave.
Tulsa OK 74119
Bus. (918) 582-6464
Fax. (918) 582-7830
joe@oklahomaadvocate.com
*and,*
Thomas Mortensen, OBA # 19183
1331 S. Denver Ave.
Tulsa, Oklahoma 74119
Bus. (918) 392-9992
Fax. (918) 392-9993
tmort70@hotmail.com

*Attorneys for Plaintiff*


**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**