**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **CISSY N.  FISHER, as Guardian of**<br>**CHRISTOPHER FISHER,** | ) <br> ) <br> ) <br> ) |
| **Plaintiff,** | ) <br> ) |
| **v.** | ) **Case No. 14-CV-678-TCK-PJC** <br> ) |
| **STANLEY GLANZ, SHERIFF OF**<br>**TULSA COUNTY, in his individual**<br>**and official capacities;**<br>**CORRECTIONAL HEALTHCARE**<br>**COMPANIES, INC., a foreign corporation;**<br>**SARA MORATAYA, in her individual and**<br>**official capacities;**<br>**ANDREW ADUSEI, M.D.;**<br>**DANIEL HUDSON, L.P.N.;**<br>**AMY WELKER, L.P.N.,**<br>**CYNTHIA FAIRCHILD, L.P.N.; and**<br>**KAREN METCALF, L.P.N.;** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| **Defendants.** | ) |

## OPINION AND ORDER[1]

Before the Court are motions to dismiss filed by Defendant Stanley Glanz (Doc. 20);

Defendant Sara Morataya (Doc.  21); Defendant Correctional Healthcare Companies, Inc.  (Doc.

24); and Defendant Andrew Adusei, M.D. (Doc.  33).  Defendants request dismissal of all claims

asserted against them in Plaintiff's Third Amended Complaint (Doc. 18).[2]

---

[1]  The Court originally ruled on these motions on January 12, 2016 (Doc. 35).  Subsequently, the Court reconsidered this decision *sua sponte* and concluded that its prior dismissal of certain Defendants may have been an abuse of discretion. (*See* Order, Doc. 54.)  Accordingly, the Court's prior Order (Doc. 35) was vacated.  This Opinion and Order does not make any other substantive changes.

[2]  In their pending motions, Defendants Glanz and Morataya incorporated arguments previously made in their motions to dismiss the Second Amended Complaint.  (*See* Docs. 10, 11.)

## I.   Factual Allegations in Third Amended Complaint

Plaintiff Cissy Fisher ("Plaintiff") is the sister and guardian of Christopher Fisher ("Fisher"), a thirty-year old male who is mentally retarded. Fisher has an IQ of 56, which is below the first percentile.  A simple one or two sentence conversation with Mr. Fisher makes it apparent that he is disabled and unable to comprehend and/or process new information like others.  Fisher receives services from the Social Security Administration and the Oklahoma Department of Human Services ("DHS"), including a DHS caseworker who regularly checks on him.  Fisher also suffers from seizures and takes daily medication consisting of either lorazepam, oxcarbazepine, or trileptal. Without this medication, the seizures can be uncontrollable and lead to hospitalization, long-term damage, or death.  Fisher's likelihood of suffering a seizure increases in stressful or strange situations.

On November 14, 2012, Tulsa County Deputy Sheriff Danny Childers ("Childers") responded to a disturbance call between Fisher and his neighbors. As a result of the information obtained from the neighbors, Childers arrested Fisher.  Fisher's mother was present at the scene and advised Childers that Fisher was mentally retarded, disabled, and required medication to prevent life-threatening seizures.

Fisher was booked into the David L. Moss Criminal Justice Center ("Jail") on or around November 14, 2012.  Immediately upon Fisher's booking, several people began making phone calls to the Jail informing the staff that Fisher was mentally disabled and required medication to prevent seizures that could lead to disabling and life-threatening injuries.  These people included Plaintiff, Fisher's mother, and Fisher's DHS caseworker.  The Third Amended Complaint does not identify the Jail staff member who spoke with these individuals when they called.

During the booking process, Childers completed an intake form based on his observations and the information he had obtained from Fisher's family. Childers noted on the booking forms that Fisher was mentally handicapped, under psychiatric or general medical care, and currently taking prescription medications. Presumably because he fulfilled his duties to Fisher by relaying this information, Childers is not named as a Defendant in the lawsuit.

Despite Childers' notations during the booking process, Detention Officer Morataya completed another intake form but stated that Fisher *did not* require any special management for mental health reasons. Another intake form regarding mental health indicated that Fisher felt nervous and depressed within the past few weeks and that he had been hospitalized for mental health and emotional reasons. That same form indicates that Fisher was not taking any medications prescribed by a physician for mental health problems.

Despite Childers' efforts and Fisher's family's "repeated pleas" for assistance in accommodating Fisher's medical and mental health needs, Fisher was not provided with his seizure medication, was not assigned for any mental-health screening, and was instead sent to a general population pod where he remained until he had life-threatening seizures after approximately forty-eight hours. His seizures were incapacitating, and Fisher was immediately taken to a hospital. Fisher ended up in a coma and spent approximately three weeks in an intensive-care unit. Fisher was released from custody while he was in the hospital. The criminal charges leading to Fisher's brief incarceration were stayed indefinitely after Fisher was found to be not competent, unable to achieve competency, and not a danger to himself or others.

Plaintiff alleges that Fisher "fell victim to a culture of indifference toward inmate health, safety, and well-being" and that Defendants "failed to provide Mr. Fisher with adequate medical and

mental health assessments and treatment, classification, supervision or protection, in deliberate indifference to his health and safety." Plaintiff alleges that "Fisher was processed through booking and intake at the Jail in a manner just like any other normal individual without serious medical and/or mental disability issues," which evidences a deliberate indifference to the needs of Fisher. (Third Am. Compl. ¶¶ 13-14.)

Plaintiff has identified several relevant policies and procedures related to mentally disabled patients that were not followed when Fisher arrived at the Jail and has also alleged that Glanz created a practice or custom of (1) failing to train regarding such policies, and (2) failing to follow these policies. Specifically, Plaintiff alleges:

> TCSO policy requires that inmates are to be classified in a way that provides safe, humane inmate treatment. The policy further requires the classification officer to privately interview the inmate to determine any "history of mental illness" and/or serious medical concerns. The Oklahoma Jail Standards also require that "[t]hose individuals who appear to have a significant medical or psychiatric problem … shall be transported to the supporting medical facility as soon as possible" and "shall be housed separately in a location where they can be observed frequently by the staff at least until the appropriate medical evaluation has been completed…."
>
> The Tulsa County Sheriff's Office policy and procedures defines "Mental Illness" as "(A)ny of various conditions characterized by impairment of an individuals normal cognitive, emotional, or behavioral functioning, and caused by social, psychological, biochemical, genetic, or other factor, such as infection or head trauma." "Mentally Retarded Person" is defined as "(A)s defined in Title 10 of the Oklahoma Statutes, a mentally retarded person is a person afflicted with mental defectiveness from birth or from an early age to such an extent that he is incapable of managing himself or his affairs, who for his own welfare or the welfare of others or of the community requires supervision, control, or care, and who is not mentally ill or of unsound mind to such an extent as to require his certification to an institution for the mentally ill." According to these definitions Mr. Fisher was classified as both mentally ill and mentally retarded.
>
> TCSO does not have policies, procedures or training in place, which would guide a Deputy in their initial approach, handling, investigation or arrest of mentally ill or mentally retarded individuals.
>
> Defendants disregarded the known and obvious risk that severe harm could result to Mr. Fisher from the lack of adequate medical and mental health assessments and treatment, classification, supervision or protection. The lack of supervision and

protection of Mr. Fisher is also consistent with a policy or custom, written or unwritten, at the Jail of understaffing and overcrowding at the Jail.

Nevertheless, in violation of these, and other, applicable policies and standards, Mr. Fisher was merely assigned to a general population pod by responsible personnel. Mr. Fisher was not referred to any mental health specialist and no further action was taken to assure that Mr. Fisher's serious mental health needs were met. Mr. Fisher was not housed separately in a location where he could be observed frequently by the staff at least until the appropriate medical evaluation had been completed.

Compounding the Defendants' failure to properly classify and monitor the Plaintiff Mr. Fisher, it should have been apparent to anyone dealing with Mr. Fisher that he was not capable of communicating to employees at the Jail what his medical needs were, thus, the Jail staff should have taken the precautions of accepting medical requests from his family and DHS caseworker or even reached out to the family or caseworker themselves.

(Third Am. Compl. ¶¶ 24-30.)

During all relevant times, Defendant Morataya was an employee and/or agent of Tulsa County Sheriff's Office ("TCSO").  Morataya is sued in her individual and official capacity. Defendant Stanley Glanz ("Glanz") was the Sheriff of Tulsa County, Oklahoma, and head of the TCSO.  Plaintiff alleges that Glanz was responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of TCSO and the Jail that violated Fisher's rights.  Glanz is sued in his individual and official capacity.

During all relevant times, Defendant Correctional Healthcare Companies, Inc. ("CHC") was a private corporation responsible for providing medical services to inmates in the custody of the TCSO, including Fisher.  Plaintiff alleges:

CHC was contracted and additionally responsible, in part, for creating and implementing policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Jail, and for training and supervising its employees. CHC was contracted and, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that CHC became an agency or instrumentality of the State and subject to its constitutional limitations.

5

(Third Am. Compl. ¶ 21.)  Plaintiff further lists five health-care providers employed by CHC -- one doctor and four nurses ("CHC Employees") -- who allegedly participated in the deficient treatment Fisher received.[3]

Plaintiff has asserted four claims for relief: (1) violation of 42 U.S.C. § 1983, against all Defendants, based on violations of Fisher's Eighth and Fourteenth Amendment rights; (2) violation of Article II, §§ 7 and 9 of the Oklahoma Constitution, against all Defendants; (3) negligence, against CHC and CHC Employees; and (4) violation of the Americans with Disabilities Act ("ADA"), against all Defendants.

## II.     Rule 12(b)(6) Standard

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the plaintiff has stated a claim upon which relief may be granted.  The inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 (2007)).  In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must "'nudge [ ] [his] claims across the line from conceivable to plausible.'" *Schneider*, 493 F.3d at 1177 (quoting *Twombly*, 550 U.S. at 569).  Thus, "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Id.*

---

[3] It is not alleged that medical personnel acted with deliberate indifference in their treatment of Fisher once the seizures began.  The allegations against medical staff seem to relate to their failure to notice Fisher's mental disability and possible need for special treatment or medication.

The Tenth Circuit has interpreted "plausibility," the term used by the Supreme Court in *Twombly*, to "refer to the scope of the allegations in a complaint" rather than to mean "likely to be true." *Robbins v. Okla. ex rel. Okla. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008). Thus, "if [allegations] are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Id.* (internal quotations omitted). "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Id.* "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id.* at 1248. In addition, the Tenth Circuit has stated that "the degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context." *Id.*

## III.    Morataya's Motion to Dismiss[4]

### A.    Section 1983 Claim - Individual Capacity - Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted). In order to survive a motion to dismiss based on qualified immunity, a plaintiff must "allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time." *Robbins*, 519

---

[4] This analysis is identical to that in the Court's original Opinion and Order. However, it is now moot because the parties stipulated to dismissal of Morataya.

F.3d at 1249. "This requires enough allegations to give the defendants *notice of the theory* under which their claim is made," but "does not mean that complaints in cases subject to qualified immunity defenses must include all the factual allegations necessary to sustain a conclusion that defendant violated clearly established law." *Id.* (internal quotation omitted and emphasis added).[5]

Because "complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants," the Tenth Circuit has explained that "[t]he *Twombly* standard may have greater bite in the qualified immunity context." *Robbins*, 519 F.3d at 1249. "Without allegations sufficient to make clear the 'grounds' on which the plaintiff is entitled to relief, it would be impossible for the court to perform its function of determining, at an early stage in the litigation, whether the asserted claim is clearly established." *Id.* (internal citation omitted).

Morataya argues that she is entitled to qualified immunity because (1) pretrial detainees do not have any Eighth Amendment protections; (2) Plaintiff has not alleged that Morataya had subjective knowledge of any substantial risk of harm, which is necessary to state a plausible claim under the Fourteenth Amendment; and (3) any relevant Fourteenth Amendment right was not clearly established at the time of the violation.

---

[5] Morataya's counsel, experienced § 1983 lawyers, inaccurately cited the burden-shifting standard applicable to assertions of qualified immunity at the *summary judgment* stage, as outlined in *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011). (*See* Def. Morataya's Mot. to Dismiss 3.) These standards are not interchangeable. *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004) (explaining that asserting qualified immunity at the dismissal stage is more challenging than at the summary judgment stage); *Choate v. Lemmings*, 294 F. App'x 390-91 (10th Cir. 2008) (unpublished).

### 1.      Eighth Amendment

The Fourteenth Amendment's guarantee of due process, and not the Eighth Amendment's guarantee against cruel and unusual punishment, is applicable to pretrial detainees alleging that state officials failed to meet their serious medical needs. *See Garcia v. Salt Lake Cnty.*, 768 F.3d 303, 307 (10th Cir. 1985). Therefore, Morataya has qualified immunity for any § 1983 claim premised upon the Eighth Amendment because Plaintiff cannot show that Morataya plausibly violated Fisher's Eighth Amendment rights.

### 2.      Fourteenth Amendment

The Supreme Court has not set forth a standard governing pretrial detainees' claims of deprivation of medical care under the Fourteenth Amendment. However, courts have consistently applied the same "deliberate indifference" test applied to claims filed by post-conviction inmates under the Eighth Amendment. *Id.* (affirming district court's use of "deliberate indifference to serious medical needs" standard set forth in *Estelle v. Gamble*, 429 U.S. 97 (1976)). Therefore, this Court has applied general Eighth Amendment standards in analyzing the Fourteenth Amendment claims asserted here.[6]

### a.      Did Morataya Plausibly Violate Fisher's Constitutional Rights?

"A prison official's deliberate indifference to an inmate's serious medical needs" violates the Eighth Amendment. *Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citing *Estelle v.*

_____

[6] The Supreme Court's recent decision in *Kingsley v. Henderson*, 135 S. Ct. 2466 (2015) (adopting objective unreasonableness standard for pretrial detainees' claims of excessive force rather than standard requiring officer to be subjectively aware that force was unreasonable), may be found to extend to pretrial detainees in medical deprivation cases. However, because *Kingsley* was not yet decided in 2012 and likely could not be said to "clearly establish" law outside the excessive force context, it has no application here.

*Gamble*, 429 U.S. 97, 102 (1976)).  The *Estelle* deliberate indifference standard "involves both an objective and subjective component."  *Id.*  The objective inquiry is whether the alleged injury or deprivation is "sufficiently serious," while the subjective inquiry is whether the prison official acted with the requisite mental culpability.  *Id.*  Morataya only challenges Plaintiff's allegations regarding the subjective component, and the Court limits its inquiry accordingly.

"[B]ecause the Eighth Amendment prohibits only cruel and unusual punishment, the prison official must have a sufficiently culpable state of mind to violate the constitutional standard." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008); *see also Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) ("The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's state of mind."). The subjective component is met if "a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" *Sealock*, 218 F.3d at 120 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  In order to act with subjective deliberate indifference, a prison official must (1) "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," (2) actually "draw the inference," and (3) "fail[] to take reasonable steps to alleviate that risk." *Tafoya*, 516 F.3d at 916 (internal quotations omitted).  "An official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation." *Id.*

"Although deliberate indifference is a subjective inquiry, a jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." *Id.*  "In response, the defendant may present evidence to show that he was in fact unaware of the risk, in spite of the obviousness."

10

*Id.*; *see also Mata*, 427 F.3d at 7752 (stating that, at summary judgment stage, the plaintiff was "required to provide evidence *supporting an inference* that defendants knew about and disregarded a substantial risk of harm to her health and safety") (emphasis added).

Morataya argues that nothing in the Third Amended Complaint indicates that she spoke directly to Childers, Fisher's family members, Fisher's DHS caseworker, or any other person who told her of Plaintiff's need for seizure medication or his mental health problems. Therefore, she argues, there are no allegations that she was "in possession of any information that could raise the inference that she was intentionally indifferent to the medical or mental health needs of Fisher." (Morataya's Mot. to Dismiss 7.)

Morataya is correct that the Third Amended Complaint is silent as to whom Fisher's family and DHS caseworker communicated with at the Jail, other than indicating they spoke with Jail staff. However, the Court finds a Rule 12(b)(6) dismissal inappropriate for two reasons. First, the alleged facts raise an inference that Morataya had knowledge of Fisher's specific need for seizure medication but disregarded the substantial risk of harm that could result if she failed to pass along this information to other prison officials. Plaintiff alleges: (1) Morataya was present at the Jail at when Fisher was booked by Childers; (2) Childers knew of the need for seizure medication and noted on his booking form that Fisher was mentally disabled and currently taking prescription medications; and (3) Morataya was present at the Jail when phone calls were made by Fisher's family and DHS caseworker regarding Fisher's need for anti-seizure medication. Her subjective knowledge of and deliberate indifference to Fisher's need for seizure medication is plausible based on the facts alleged.

11

Second, the facts alleged raise an inference that Morataya knew Fisher was mentally ill or mentally retarded, as defined in Jail policies, but acted with deliberate indifference to the risk that he was unable to effectively communicate with Morataya regarding any medical prescriptions he needed and/or that his medical needs would be overlooked in a general population pod.  Depending on the severity of Fisher's disability, how Fisher acted at the Jail, what Childers said to Morataya, if anything, and if and how Fisher interacted with Morataya, this subjective knowledge of Fisher's mental disability -- coupled with Morataya's failure to refer Fisher to a medical unit or for any further mental health screening -- could be deemed deliberate disregard of a substantial risk of harm. *See Sealock*, 218 F.3d at 1211 (explaining that one type of deliberate indifference can occur when prison officials fail to perform a "gatekeeping" role and prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment); *cf. Cox v. Glanz*, 800 F.3d 1231, 1252 (10th Cir. 2015) (finding, at summary judgment stage, that Plaintiffs' evidence did not indicate that nurses "possessed sufficient knowledge that would permit them to conclude" that inmate presented substantial risk of suicide).  The plausibility of this second theory is enhanced by the fact that Morataya's alleged conduct allegedly violated both Oklahoma and TCSO policies regarding screening of mentally ill or mentally disabled inmates.  (*See* Third Am. Compl. ¶¶ 24-30.)

### b.      Was the Right Clearly Established at Time of Violation?

As explained above, construing the Third Amended Complaint favorably to Plaintiff, the pleadings raise two plausible theories of Morataya exhibiting deliberate indifference to Fisher's serious medical needs.  One assumes Morataya's subjective knowledge of Fisher's severe mental disability *and* the need for life-saving anti-seizure medication; the other assumes only subjective

12

knowledge of Fisher's severe mental disability.  Thus, the Court frames the "clearly established right" questions as follows: (1) whether it was clearly established that an intake officer's failure to inform medical or other prison officials of a mentally disabled detainee's need for life-saving seizure medication, when such need was known, constitutes deliberate indifference to serious medical needs; and (2) whether it was clearly established that an intake officer's placement of an obviously mentally disabled inmate into general population, without conducting further screening to determine whether he relied upon medications for survival, constitutes deliberate indifference to serious medical needs.[7]  Answering one in the affirmative is sufficient to survive a motion to dismiss; however, the Court finds both scenarios would result in violations of clearly established law.

Under the first theory, Morataya was aware of repeated notifications by the detainee's family of his mental health condition and need for anti-seizure medication in order to prevent life-threatening injuries.  Warnings were given by family members and others both at the time of arrest and after Fisher arrived at the Jail.  Failing to provide a life-saving medication to a mentally handicapped individual within 48 hours upon booking into the Jail, when the family had communicated the need for such life-saving medication, falls under clearly established law prohibiting deliberate indifference to serious medical needs.  The Court need not engage in a "scavenger hunt" for a factually similar case; it is sufficient that the facts fit neatly into a clearly

---

[7] The Court rejects both parties' framing of the "clearly established right" questions. Plaintiff employed a high level of generality in framing the issues. (*See* Resp. to Morataya's Mot. to Dismiss 9-15) (discussing general law regarding lack of need to know risk to particular inmate; failure to enforce policies as rising to level of deliberate indifference; and gatekeepers' failures as resulting in deliberate indifference).)  Morataya ignored certain facts present here -- namely, the specific warnings provided by Fisher's family prior during the intake process.  (*See* Morataya's Mot. to Dismiss 4 (framing the right as the "right to be properly screened for mental health issues such that [Fisher] could be classified and monitored for his medical needs" and analogizing to lack of clearly established law regarding suicide-screening procedures).

established legal principle and that a reasonable state official would be on notice that depriving a detainee of life-saving medication could constitute deliberate indifference to a serious medical need. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (holding that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful"); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (quotations omitted) (explaining that "[t]he *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional"); *see also Cox*, 800 F.3d at 1251 (indicating that state actor's knowledge of that particular inmate's risk of suicide would be sufficient to violate clearly established law prohibiting deliberate indifference to significant risk of serious harm); *Matis v. Johnson*, 262 F. App'x 671, 673 (5th Cir. 2008) (jury could conclude that intake nurse at juvenile facility acted with deliberate indifference because she "had actual knowledge of a prior suicide attempt and failed to properly complete the intake form that would have revealed [the deceased's] suicide risk to other staff members;" knowledge of his need for medication for bipolar disorder; clear signs of self-mutilation at the time of intake, and evidence that his father told arresting officers that his son was suicidal).

The second theory -- failing to properly screen or investigate whether a mentally retarded pre-trial detainee needs any prescription medication and then placing him in a general population pod where he is unlikely to receive any particularized mental health or medical attention -- presents

a closer question.[8]  Recently, the Tenth Circuit held that an "inmate's right to proper prison suicide screening procedures during booking" was not clearly established as of July 2009.  *Cox*, 800 F.3d at 1247 ("We conclude that the right that Ms. Cox's claim implicates—i.e., generally, an inmate's right to proper prison suicide screening procedures during booking—was not clearly established in July 2009.").  However, neither *Cox* nor Morataya's two other cited cases regarding suicide screening are controlling as to the "screening" question here.  Detainees who present with severe mental disability present different risks than seemingly normal arrestees or prisoners who have latent suicidal tendencies.  In other words, there is a stronger case for deliberate indifference flowing from screening procedures that fail to ascertain the need for any life-saving prescription medications (either by asking a mentally competent detainee or taking other steps with a mentally incompetent detainee) than those that fail to ascertain suicide risks.

Neither party has offered case law that would be considered directly on point regarding an intake officer's constitutional obligations to a mentally disabled pre-trial detainee who needs life-saving prescription medications.  However, in order to comply with constitutional guarantees, a state must make "available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates." *Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980).  "This includes medical treatment for inmates' physical ills, dental care, and psychological or psychiatric care." *Id.*  Further, prison officials can be found deliberately indifferent when they fail to perform "gatekeeping" roles, thereby preventing serious medical needs from being met. *Sealock*, 218 F.3d at 1211.  In light of *Ramos* and *Sealock*, the Court believes a reasonable official

---

[8] It is not alleged that anything about Fisher's physical appearance or disability made it clear he needed anti-seizure medication.  Thus, the second theory turns on some sort of improper screening, investigation, or classification of all mentally handicapped pre-trial detainees.

in Morataya's position is on notice that she must take minimal steps during the intake process to ensure that pre-trial detainees who clearly present as mentally disabled obtain basic medical care, including ascertaining whether they need any prescription medications for acute and serious medical conditions.   As alleged by Plaintiff, Morataya "served as a gatekeeper . . . responsible for accommodating inmates who suffer from disabilities" and this "would be the only way to properly identify disabled persons so that other professionals would be alerted and made responsible" for treating Fisher. (Third Am. Compl. ¶ 31.)  Booking Fisher as she would any other pretrial detainee during the intake process, and then placing him in general population, implicates a clearly established right to receive adequate "gatekeeping" treatment in order to obtain basic medical care upon entry into the Jail.

**B.      Section 1983 - Official Capacity**

The Court agrees with Morataya that the "official capacity" claims against her, which are essentially municipal liability claims against TCSO, are redundant with the "official capacity" claims asserted against Glanz.  The Court therefore dismisses any official capacity claims asserted against Morataya and will address municipal liability in the context of the official capacity claim against Glanz.

**C.      Oklahoma Constitutional Claim - Statute of Limitations**

The lawsuit was filed on November 12, 2014, which is within two years of Fisher's alleged injury date of November 14, 2012.  Morataya argues that Plaintiff's claim arising under the Oklahoma Constitution is time-barred because Oklahoma law provides only a one-year statute of limitation for "all actions filed by an inmate or by a person based upon facts that occurred while the person was an inmate in the custody" of the State, a contractor of the State, or a political subdivision

16

of the State.  Okla. Stat. tit. 12, § 95(A)(11).  Plaintiff argues that the Oklahoma constitutional

claim is subject to the more general two-year statute of limitations applicable to actions for "injury

to the rights of another, not arising on contract, and not hereinafter enumerated."  Okla. Stat. tit. 12,

§ 95(A)(3).

In a federal case involving allegations of sexual assault upon female inmates by employees

of the Oklahoma Department of Corrections, the court held that § 95(A)(11)'s specific statute of

limitations governed the inmates' state constitutional claims, rather than § 95(A)(3)'s more general

statute of limitations.  *See Koch v. Juber*, No. CIV-13-0750-HE, 2014 WL 2171753, at *2 (W.D.

Okla. May 23, 2014).  The court explained that, although courts have held that § 95(A)(11) does not

apply to *federal* constitutional claims arising under 42 U.S.C. § 1983, that is simply because the

"Oklahoma legislature does not have the authority to determine the limitations period for a § 1983

or any other federal claim."  *Id.*  In contrast, "Oklahoma law dictates the statute of limitations

applicable to plaintiffs' state law claims and the specific statute, § 95(A)(11), rather than the more

general statute, § 95(A)(3), applies."  *Id.*  Following the reasoning in *Koch,* the Court holds that §

95(A)(11) trumps the more general § 95(A)(3) when a state constitutional claim is brought by an

inmate or based upon facts that occurred while the person was an inmate in state custody.[9]

---

[9] Plaintiff is correct that this Court has applied the two-year statute of limitations found in § 95(A)(3) to a claim for unreasonable search and seizure arising under Article 2, Section 30 of the Oklahoma Constitution.  *See Williams v. City of Tulsa*, No, 11-CV-469-TCK-FHM, 2014 WL 2738425, at *2 (N.D. Okla.  June 17, 2014).  However, Mr. Williams was not an inmate in the custody of the State at the time he asserted his constitutional claim; nor was his claim based on facts that occurred while he was in custody.  Therefore, the more specific statute of limitations in § 95(A)(11) did not come into play.

Further, Fisher qualifies as "an inmate in the custody" of a political subdivision of the state for purposes of § 95(A)(11).  Although Fisher was a pretrial detainee rather than a convicted prisoner, courts have applied § 95(A)(11) to pretrial detainees without any discussion of whether pretrial detainees qualify as "inmates." *See Nichols v. Logan Cty. EMS*, No. CIV-11-1507-D, 2013 WL 1633284, at *3 (W.D. Okla. Apr. 16, 2013) (applying § 95(A)(11) to state-law claims based upon the plaintiff's treatment by emergency personnel while he was a pretrial detainee); *Allen v. Yates*, No. CIV. 08-215-FHS, 2008 WL 5244871, at *1 (E.D. Okla. Dec. 15, 2008) (applying § 95(A)(11) to state-law tort claims based upon the plaintiff's treatment during intake processing). This treatment of pretrial detainees as falling within the definition of "inmates" is consistent with the plain meaning of "inmate," which is "any of a group occupying a single place of residence; especially: a person confined (as in a prison or hospital)."  Merriam-Webster Online Dictionary. 2014.  http://www.merriam-webster.com (16 November 2015).  Fisher was confined in a prison, could not leave, and was therefore an "inmate in the custody" of the Jail for purposes of § 95(A)(11) when the deprivation occurred.  Accordingly, Plaintiff's claim against Morataya arising under the Oklahoma Constitution is untimely as filed outside the one-year statute of limitations.

**D.    ADA**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  This provision extends to discrimination against inmates detained in a county jail. *Robertson v. Las Animas Cty. Sheriff's Dept.*, 500 F.3d 1185, 1193 (10th Cir. 2007).  "To state a claim under Title II, the plaintiff must allege that (1) he is a qualified individual with a disability,

18

(2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Id.*

Morataya seeks dismissal of Plaintiff's ADA claim on grounds that "she has not plead the required *mens rea* for the claim, namely, that Morataya was aware of Fisher's mental disability and discriminated against him because of the disability." (Morataya's Mot. to Dismiss 11.)  Thus, she challenges only the third element.  For the same reasons explained *supra*, the Court finds that the factual allegations are sufficient to create the inference that Morataya was aware of Fisher's mental disability either based on its obviousness or based on Fisher's family's repeated notifications to Jail staff by Fisher's guardian, family, and DHS caseworker.[10]

## IV.   Glanz's Motion to Dismiss

### A.      Section 1983 Claim - Individual Capacity - Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted).  In order to survive a motion to dismiss based on qualified immunity, a plaintiff must "allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time."  *Robbins*, 519 F.3d at 1249.  "This requires enough allegations to give the defendants *notice of the theory* under

---

[10]  Morataya also makes a one-sentence argument that "it is doubtful that Plaintiff's claims of inadequate claims of medical treatment to a disabled prisoner constituted an ADA violation." (Morataya's Mot. to Dismiss 11.)  The Court finds no need to address this half-hearted argument; it is a defendant's burden to show failure to state a claim for relief, not that a claim is "doubtful."

19

which their claim is made," but "does not mean that complaints in cases subject to qualified immunity defenses must include all the factual allegations necessary to sustain a conclusion that defendant violated clearly established law." *Id.* (internal quotation omitted and emphasis added).

Glanz's brief is difficult to follow, although he clearly asserts qualified immunity. The Court interprets Glanz's brief as asserting three arguments, all of which go to the first prong of the qualified immunity analysis -- namely, whether the allegations establish that Glanz plausibly violated Fisher's Fourteenth Amendment rights. Such arguments are: (1) pretrial detainees do not have any Eighth Amendment protections; (2) Morataya is entitled to qualified immunity for the reasons set forth in her brief, thereby rendering any supervisory liability theory against Glanz unavailing, *see Martinez v. Beggs*, 563 F.3d 1082, 1091-92 (10th Cir. 2009) (holding that sheriff cannot be liable for policy, training, or supervision without an underlying constitutional violation by his subordinate); and (3) even assuming Morataya is not entitled to qualified immunity, Glanz is entitled to qualified immunity because Plaintiff has failed to allege any deliberate, intentional act committed personally by Glanz that caused the alleged deprivation. (*See* Glanz's Mot. to Dismiss, Doc. 11, incorporated by reference into Glanz's Mot. to Dismiss Third Am. Compl., Doc. 20.)

### 1.    Eighth Amendment

As previously explained, the Fourteenth Amendment's guarantee of due process, and not the Eighth Amendment's guarantee against cruel and unusual punishment, is applicable to pretrial detainees alleging deliberate indifference to medical needs. *See Garcia v. Salt Lake Cnty.*, 768 F.3d 303, 307 (10th Cir. 1985). Therefore, Glanz is entitled to qualified immunity with respect to any § 1983 claim premised upon the Eighth Amendment.

### 2.      Fourteenth Amendment

#### a.      Lack of Underlying Violation by Morataya

For reasons explained *supra*, Plaintiff has alleged sufficient facts to state a claim against Morataya in her individual capacity for violation of Fisher's clearly established Fourteenth Amendment rights, and Morataya is not entitled to qualified immunity. Therefore, the Court rejects Glanz's argument that he is entitled to qualified immunity based on the absence of a sufficiently pled constitutional violation by Morataya.

#### b.      Lack of Any Personal Role by Glanz

In its entirety, Glanz's argument on this point is:

> Plaintiff fails to provide any factual allegations, other than conclusory statements, which have nothing to do with Plaintiff's alleged injuries, concerning Glanz's individual role that he committed a "deliberate intentional act" with the intention of depriving Fisher of his constitutional rights. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). Accordingly, Glanz must be granted qualified immunity from Plaintiff's Claims and the same should be dismissed.

(Doc. 11 at 6.)  This appears to be challenging whether the facts adequately allege any personal involvement by Glanz and/or that Glanz had the requisite mental state.[11]

---

[11]   In *Cox*, the court noted that Glanz's counsel had "framed his qualified-immunity arguments in terms of [the plaintiff's] purported failure to suitably establish a violation of a constitutional right" and that Glanz "did not go one step further and argue that there was no extant clearly established law supportive of [the plaintiff's] claims." *Cox*, 800 F.3d at 1240. Glanz is represented by the same lawyers in this case, and such lawyers have framed their qualified immunity arguments in a similar manner. Although the Tenth Circuit implied that a plaintiff bears some burden to prove the "clearly established" prong based on a defendant's insertion of the magic words "qualified immunity" anywhere in summary judgment briefing, *see Cox*, 800 F.3d at 1244-46, this case is at the Rule 12(b)(6) stage. Further, Glanz's lawyers are well-versed in this area of law, and the Court finds no need to *sua sponte* research and analyze aspects of the qualified immunity analysis they did not brief.

There are no allegations that Glanz interacted with Fisher in any way during Fisher's short stay at the Jail or was told about Fisher's mental health condition and/or need for seizure medication by one of his employees.  Therefore, Plaintiff's § 1983 claim against Glanz in his individual capacity is necessarily based on the concept of § 1983 "supervisory liability," which is an uncertain and difficult area of Tenth Circuit law.  *See generally Dodds v. Richardson*, 614 F.3d 118 (10th Cir. 2010) (explaining difficulties in analyzing supervisory liability after *Iqbal*).  Nonetheless, to establish a claim of supervisory liability under § 1983, the Tenth Circuit has stated that a plaintiff must plead and ultimately prove that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation."  *Dodds*, 614 F.3d at 1199.  Supervisors "may be liable under § 1983 where an affirmative link exists between the unconstitutional acts by their subordinates and their adoption of any plan or policy—express or otherwise—showing their authorization or approval of such misconduct."  *Id.* at 1199-1200 (alterations and quotations omitted).  Stated differently, § 1983 liability may be imposed upon individual supervisors who "act with the requisite degree of culpability to promulgate, create, implement, or otherwise possess responsibility for the continued operation of policies that cause the deprivation of persons' federally protected rights."  *Id.*  Like any other defendant, a supervisor must be found to have "direct personal responsibility" for the harm and must have committed a deliberate, intentional act.  *Porro*, 624 F.3d at 1327-28.

The Third Amended Complaint alleges that Glanz caused Fisher's injuries by: (1) sanctioning an ongoing practice of inadequate mental health screening and inadequate treatment of mentally disabled patients once they are or should have been identified as such, in direct

22

contravention of written policies established to protect mentally ill inmates; (2) failing to adequately change or improve these practices at the Jail after an audit by the National Commission on Correctional Health Care in 2007, which reported, among other health care deficiencies, a "failure to perform mental health screenings" (Third Am. Compl. ¶¶ 38-39); and (3) failing to improve or change practices after an investigation by the Oklahoma Department of Health following an inmate suicide in 2009, which reported a failure to follow Oklahoma Jail Standards regarding time allowed for mental health evaluations, segregation of mentally ill inmates from the general population, and level of observation of mentally ill inmates (Third Am. Compl. ¶ 40). Plaintiff alleges that these 2009 findings "strongly signaled that inmates with mental health problems were being put at excessive risk by inadequate assessments and untimely treatment" and yet Glanz "failed to take reasonable steps to alleviate the known and excessive risks." (*Id.* ¶ 41.)

Based on the allegations, the Court finds that Fisher has stated a plausible supervisory liability claim. Plaintiff does not seek to hold Glanz liable based simply on his status as Morataya's "supervisor." She alleges that Glanz was specifically aware of deficiencies in his staff's treatment of a class of inmates that created risks to their safety, and yet made a deliberate choice to ignore these risks in order to save money, time, or both. She further alleges that Glanz deliberately failed to follow policies or train his subordinates to follow policies designed to protect mentally disabled inmates. These facts, taken together, could plausibly be deemed personal participation and intentional, deliberate action by Glanz. As to causation, the Court finds an affirmative link between Glanz's alleged deliberate indifference and the injury that befell Fisher -- namely, being processed by Morataya in a manner that permitted him to be placed in general population without medically necessary anti-seizure medication. In short, Plaintiff has alleged that Glanz personally exhibited

23

deliberate indifference to a known risk identified in prior audits and that such indifference directly caused Fisher's injury. *See Revilla v. Glanz,* 7 F. Supp. 2d 1207, 1218 (N.D. Okla. 2014) (citing same audits and holding that plaintiffs stated a claim for individual supervisory liability against Glanz based on the "clear notice to Sheriff Glanz of a seriously deficient medical and mental health care which placed inmates at serious risk of injury or death").

Before concluding its analysis of supervisory liability, the Court must address the Tenth Circuit's recent decision in *Cox v. Glanz*, 800 F.3d 1231 (10th Cir. 2015). In *Cox*, the court reversed the district court's denial of summary judgment on a supervisory liability claim against Glanz in an inmate-suicide case because Glanz lacked personal knowledge of that *particular inmate*'s suicide risk. *Cox*, 800 F.3d at 1250 (emphasis added) (holding that "irrespective of the alleged deficiencies in the Jail's suicide-screening protocols, in order for any defendant, including Sheriff Glanz, to be found to have acted with deliberate indifference, he needed to first have knowledge that the *specific inmate* at issue presented a substantial risk of suicide"). This holding at least arguably contradicts Tenth Circuit law holding that a prison "official's knowledge of the risk need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury might occur." *See Tafoya*, 516 F.3d at 916; *see also Farmers v. Brennan*, 511 U.S. 825, 843 (1994) (cited by *Tafoya*). The *Cox* court addressed *Tafoya* in a footnote, stating that "our study strongly indicates that *Tafoya* is distinguishable and should not cause us to question the clear guidance of our cases decided in the jail-suicide context." *Cox*, 800 F.3d at 1251 n.11. The footnote did not discuss the Supreme Court's decision in *Farmers*.

*Cox* does not entitle Glanz to qualified immunity in this case for two reasons. First, based on the reasoning in footnote 11 in *Cox*, the Court interprets the "inmate-specific" knowledge

24

requirement as limited to the jail-suicide context.  Second, if *Cox* attempts to adopt a broader "inmate-specific" knowledge standard for other types of jailhouse injuries, this seems contrary to the Supreme Court's reasoning in *Farmers*.  The *Farmers* Court held that "a prison official [may not] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Id.* at 843.  In explaining general principles underlying the "deliberate indifference" standard, the Supreme Court explained that "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him *or because all prisoners in his situation face such a risk*." *Id.* (emphasis added).  Citing common law principles, the Court explained that liability attaches for deliberately indifferent conduct even when a victim is "unanticipated," such as those catching an infectious disease even though the infection "might not affect all of those exposed" or those dying in a fire, even though a deliberately indifferent owner "did not know in advance . . . which patrons would lose their lives." *Id.*  Thus, the Court interprets *Cox* as applying only in the jail-suicide context and will apply the *Tafoya*/*Farmers* approach to the knowledge requirement in this case, meaning Plaintiff need not show that Glanz was subjectively aware of Fisher's situation. *See Sanders v. Glanz*, --- F.3d ---, 2015 WL 5797026, at *13 (N.D. Okla.  Sept.  30, 2015) (interpreting *Cox* as limited to "one class of jail cases (jail suicide)" and applying the *Farmers* deliberate indifference standard to prison assault case).

### B.    Section 1983 Claim - Official Capacity - Municipal Liability

A claim against Glanz in his official capacity "is essentially another way of pleading an action against the county or municipality" he represents. *Porro*, 624 F.3d at 1328.  Thus, the Court

must apply municipal liability standards in assessing whether Plaintiff's official capacity claim against Glanz survives a motion to dismiss.  A county may be held liable "when the enforcement of their policies or customs by their employees causes a deprivation of a person's federally protected rights."  *Dodds*, 614 F.3d at 1202.  A municipal policy or custom can include formal regulations or policies; informal customs amounting to widespread practices that are so permanent as to constitute a custom or usage; decisions by final policymakers; ratification of employees' decisions by a final policymaker; and failure to train or supervise, so long as failure results from deliberate indifference. *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir.  2010).

A plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Dodds*, 614 F.3d at 1202 (internal quotations omitted).  A plaintiff does so by identifying a specific deficiency that was so obvious and closely related to his injury that it "might fairly be said that the official policy or custom was both deliberately indifferent to his constitutional rights and the moving force behind his injury."  *Porro*, 624 F.3d at 1328.

For the same reasons explained above with respect to the supervisory liability claim, the Court finds that Plaintiff's allegations regarding Glanz's practices and customs of inadequate mental health screening and deficient treatment of mentally disabled patients bear a sufficient causal link to Fisher failing to receive his seizure medication within a reasonable time upon his being taken into custody at the Jail.  *See Revilla,* 7 F. Supp. 2d at 1218 (holding that plaintiffs stated a claim for municipal liability against Glanz in his official capacity based on custom of systemic, dangerous, and unconstitutional failures to provide adequate medical and mental health care to inmates at the Tulsa County Jail); *see generally Doe v. Taylor Ind. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994)

("The legal elements of an individual's supervisory liability and a political subdivision's liability, however, are similar enough that the same standards of fault and causation should govern.").

### C.      Oklahoma Constitutional Claim - Statute of Limitations

Glanz made the same statute of limitations argument as Morataya.  For the same reasons explained *supra*, the Court finds any claim against Glanz arising under the Oklahoma Constitution to be untimely.

### D.      ADA

Glanz made the same arguments as Morataya in favor of dismissal of the ADA claim.  For the same reasons explained *supra*, the Court rejects such arguments and finds that Plaintiff's ADA claim may proceed.

## V.      CHC's Motion to Dismiss

### A.      Section 1983 Claim

CHC makes several arguments in support of dismissal, including that the Third Amended Complaint does not adequately or specifically allege any underlying constitutional violation committed by CHC employees.  Because the Court accepts this argument, it does not reach CHC's remaining arguments that it was not acting under color of state law and cannot be subject to municipal liability as a private corporation.[12]

Plaintiff alleges that five CHC employees -- one doctor and four nurses -- "participated in the deficient treatment Mr. Fisher received." (Third Am. Compl. ¶ 21(a).)  Plaintiff further alleges that these medical professionals' care of Fisher was negligent. (*Id.* ¶¶ 87-93.)  However, this is the

---

[12]  For a thorough discussion of these issues in relation to CHC, *see Revilla v. Glanz*, 8 F. Supp.  2d 1336 (N.D. Okla.  2014) (rejecting both arguments and denying CHC's motion to dismiss).

extent of the detail provided in the Third Amended Complaint regarding the role of any particular CHC employee in depriving Fisher of his constitutional rights. Plaintiff has provided no allegations regarding what the doctor or nurses did or did not do except that they somehow participated in the alleged deficient treatment.

The Court finds that the allegations against the CHC Defendants fail to meet the *Twombly* standard because they do not provide notice to CHC or its employees as to what specific actions they took that constituted deliberate indifference. With respect to Morataya and Glanz, Plaintiff clearly outlined the alleged indifference occurring during the intake process that led to the alleged violation of Fisher's constitutional rights and further identifies certain practices and customs implemented and approved by Glanz that caused the violation to occur. Lacking, however, are any similarly specific allegations as to what role each CHC employee played in the deprivation. The *Twombly* "bite" comes into play because the Court cannot determine what these alleged state officials did or did not do that constituted deliberate indifference to Fisher's rights.

If and to the extent the allegations are simply that all five officials failed to sufficiently "monitor" Fisher to avoid seizures while he was housed in general population, this is the type of general allegation that does not provide any plausible basis for recovery. (Third Am. Compl. ¶ 33) (vaguely alleging that "medical and correctional staff should have been on high alert"). Plaintiff has not alleged that any of the five officials even had contact with or knowledge of Fisher and his mental health condition prior to the occurrence of the seizures. Naming every doctor or nurse who was on duty or who stole a glance at Fisher during his custody is the type of pleading *Twombly* seeks to quelch, particularly in the § 1983 context. In short, Plaintiff has failed to state a claim against CHC because Fisher's seizure was not plausibly caused by any deliberately indifferent medical treatment

28

by doctors or nurses.  In fact, it appears medical staff took all appropriate steps once Fisher's seizure began by transporting him to a hospital and were in no way indifferent to his medical needs. Instead, the adequately pled claim relates to failures in the "gatekeeping" process that deprived medical staff of the opportunity to provide Fisher his prescription anti-seizure medication while he was in custody.

**B.      State Law Claims**

For the same reasons explained *supra*, the state constitutional claim and negligence claim against CHC are barred by the statute of limitations.

**C.      ADA**

With respect to her ADA claim, Plaintiff alleges:

> Although the Defendants were made aware of Mr. Fisher's medical and mental health condition, he was prevented access to appropriate programs and segregation from the general population because Mr. Fisher was unable to articulate his disability and need for medication. This practice of failing to provide reasonable accommodations to obviously disabled individuals created a significant risk to the health and safety [of] the disabled individuals an to the inmates that are housed with the disabled.

(Third Am. Compl.  ¶ 97.)  Again, these failures to accommodate Fisher's disability relate to Fisher's classification and placement completed by TCSO employees and not medical treatment or monitoring performed by CHC employees.  While there could possibly be instances in which medical staff of a Jail intentionally discriminated against an inmate based on his disability, the vague allegations in this case are not sufficiently specific to implicate CHC or its employees in this type of intentional disability discrimination.  At most, the Third Amended Complaint alleges that CHC's medical staff "participated" in Fisher's treatment but did so negligently.  This is not enough to state

a plausible claim for intentional discrimination against by any CHC employee and, in turn, against CHC.

## VI.   Defendant Adusei

Only one CHC Employee, Andrew Adusei ("Adusei"), filed a motion to dismiss, arguing that he was not timely served and that Plaintiff has failed to state a claim for relief against him.  The Court assumes without deciding that Adusei was timely served but finds that Plaintiff has failed to state any claim for relief against him for the same reasons explained above with respect to CHC. With respect to 42 U.S.C. § 1983 and the ADA, the allegations are not specific as to what Adusei did or failed to do that deprived Fisher of a constitutional right or intentionally discriminated against him based on his mental handicap.  With respect to any state law claims, the applicable one-year statute of limitations has expired.

## VII.   Conclusion

This Opinion and Order supersedes the Court's Order of January 12, 2016 (Doc. 35), and such order has been vacated.

Morataya's Motion to Dismiss (Doc.  21) and Glanz's Motion to Dismiss (Doc.  20) are granted in part and denied in part.  The motions are granted as to the state constitutional claim and denied as to all other claims.  Defendant Correctional Healthcare Companies, Inc.'s Motion to Dismiss (Doc. 24) and Defendant Andrew Adusei, M.D.'s Motion to Dismiss (Doc. 33) are GRANTED, and all claims against them are dismissed with prejudice.

Morataya and Glanz's motions to dismiss the Second Amended Complaint (Docs. 10, 11) are denied as moot, although the Court considered all arguments made therein.

30

Defendants Hudson, Welker, Fairchild, and Metcalf, which were previously terminated as parties, are hereby reinstated as parties.

**SO ORDERED** this 24th day of March, 2016.

**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**

31